NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 250022-U

NO. 4-25-0022

IN THE APPELLATE COURT

FILED
March 25, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| CHRISTOPHER L. MARTINEZ, | ) | No. 24CF305 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Knecht and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed the trial court's order, holding the trial court made sufficient findings in denying defendant pretrial release.

¶ 2    Defendant, Christopher L. Martinez, appeals the trial court's order denying him pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2022)), hereinafter as amended by Public Act 101-652, § 10-255 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act (Act). See Pub. Act. 102-1104, § 70 (eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (setting the Act's effective date as September 18, 2023). On appeal, defendant challenges his detention by way of a notice in lieu of a memorandum. Accordingly, defendant's argument on appeal is his motion for relief. In defendant's motion for relief, he asserts the State did not prove by clear and convincing evidence (1) he committed a qualifying offense for pretrial detention and

(2) there was no condition or combination of conditions that could mitigate any risk he posed. For the reasons set forth below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On November 14, 2024, defendant was charged by information with one count of residential burglary, a Class 1 felony (count I) (720 ILCS 5/19-3 (West 2022)), one count of unlawful possession of a weapon by a felon, a Class 3 felony (count II) (*id.* § 24-1.1(a)), and one count of theft, a Class 3 felony (count III) (*id.* § 16-1(a)(1)). A warrant was issued for defendant's arrest, and he was arrested on November 26, 2024.

¶ 5        On November 27, 2024, the trial court conducted a probable cause hearing. The State also filed a verified petition for detention pursuant to section 110-6.1 of the Code (725 ILCS 5/110-6.1 (West 2022)) as to counts I and II of the information, alleging defendant was charged with a detainable offense and his pretrial release posed a real and present threat to the safety of any person or the community. A hearing was held on the petition on the same day.

¶ 6        After probable cause was found by the trial court, the case transitioned to the detention hearing. The State began by briefly offering information about the abilities of the Office of Statewide Pretrial Services (OSPS) regarding pretrial supervision with GPS monitoring. Specifically, the State noted the limitations of the monitoring in that it only provides the location of the individual wearing the monitor, not what they might be doing. The State then asked the court to take notice of the fact defendant was a felon, as reflected in the OSPS report. The State argued for detention and summarized the facts that had just been presented at the probable cause hearing. Specifically, the Livingston County Sheriff's Department was notified of a break-in at a rural Pontiac, Illinois, address on October 28, 2024. Steven Bressner, the owner of the home, notified police that "his house was ransacked and he was missing at least three high-end pellet guns and

- 2 -

possibly some other guns." After Livingston County Sheriff's Deputy Kassidi Burton arrived on scene and met with Bressner, she was informed Bressner arrived home from work and saw the deadbolt was unlocked and the doorjamb was broken. Someone had "rummaged through his belongings." Bressner informed Deputy Burton that he was missing several of his guns, one being a "stainless steel Security-Six 357 revolver." Bressner also informed Deputy Burton he had a security camera system all around the residence with a Ring doorbell camera.

¶ 7        Livingston County Sheriff's Sergeant Andrew Rork arrived on the scene and viewed Bressner's Ring security video recording with Deputy Burton. The video showed a dark-colored SUV entering Bressner's driveway. A male exited the vehicle, approached the north front door, and rang the doorbell. No one answered, so the male returned to the vehicle and drove to the east side of the house and parked. One male entered the garage while another male used a pry bar to enter through the south back door. The video showed the males carrying items out of the house and the SUV leaving about 15 minutes later.

¶ 8        Detective Drew Chase, also of the Livingston County Sheriff's Department, photographed the scene, including a shoe print from what appeared to be a Nike Air Max. He observed Bressner's bedroom had been ransacked. While the gun safe was intact, the trim piece adjacent to the closet door latch was damaged. Detective Chase was told that a couple of handguns were missing, along with two Gamo adult precision air rifles. Detective Chase viewed the Ring video recording and saw a male wearing a black hoodie, with tattoos on his hands, and smoking a cigarette walk to Bressner's door and ring the doorbell. Detective Chase noticed two other men in the recording, one wearing all black and the other wearing a black Nike sweatshirt and shoes, walk around the residence. Another male with tattoos on his hands used a small pry bar to gain entry into the residence. Further Ring video recording showed the men carrying items out of Bressner's

house and the vehicle leaving. As the vehicle is seen pulling out, two males are running to get into the vehicle.

¶ 9　　　　The investigation continued on October 30, 2024, when Sergeant Darrick Renken contacted Detective Chase, notifying him he had just arrested a man who had a similar tattoo to one of the men suspected to be a part of the burglary. Sergeant Renkin brought the suspect (later identified as defendant) to the Livingston County Public Safety complex, where he was given *Miranda* warnings and interviewed by Detective Chase (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Defendant was told about the investigation and asked who he was with on the morning of the burglary. Defendant claimed he was with his cousin but would not provide his cousin's name or the time they were together. Defendant continued to be questioned, but once he was told about the video evidence, he requested an attorney, and the interview ended.

¶ 10　　　　The next day, Livingston County Sheriff's Deputy Brandon Jenkins told Detective Chase he had possibly located the getaway vehicle seen on Bressner's Ring video footage. Deputy Jenkins saw a black Ford Expedition "leaving Streator at approximately 7:42 a.m. on Bloomington Street" before that same vehicle "returned to Streator around 8:36 [a.m.]" when he was viewing footage from the Flock system (an automated surveillance technology that includes video surveillance, license plate recognition, and gunfire locator technology) from the day of the burglary. Detective Chase obtained the vehicle's registration number and found several photos of the vehicle on the Flock system. Of note were certain characteristics of the vehicle, including black rims on the front tires, silver rims on the rear tires, an all-black front end with a black Ford symbol, and an object hanging from the front mirror. These characteristics matched the SUV seen on Bressner's Ring video footage. A check of the vehicle's registration number revealed the SUV was involved in a traffic stop on the evening of October 28, 2024. The officers' body-worn camera

video of the traffic stop was obtained, and a loud muffler like sound could be heard on the video, like the one on Bressner's Ring video footage. The body-worn camera video showed a consensual search of the vehicle, which uncovered a pry bar and screwdriver, just like the items seen in Bressner's Ring video footage.

¶ 11 On November 1, 2024, Detective Chase interviewed defendant regarding a separate case (where defendant was arrested on October 31, 2024, for riding a stolen bicycle from a burglary on October 30, 2024). Defendant was given *Miranda* warnings and then asked if he was willing to answer questions. Defendant agreed and was questioned about the stolen bicycle. However, when defendant was asked about the burglary at Bressner's residence, he requested an attorney. Detective Chase returned defendant to the jail and asked the correctional officer to check defendant's property tote for a cell phone. In the property tote was a cell phone, a black ski mask, and a pair of "whitish gray and black Nikes." Detective Chase recognized those Nikes as the ones worn by the man that used a pry bar during Bressner's burglary. After comparing defendant's shoes to those worn by the man using the pry bar on Bressner's Ring video footage, Detective Chase confirmed they were a match. In addition, that subject in the video wore a black ski mask and had "hand tattoos that were very similar to [defendant's]."

¶ 12 Detective Chase determined the owner of the Ford Expedition seen in the Ring video footage was Albert Preidis, defendant's cousin. When interviewed, Albert confirmed it was his SUV in the video and admitted his brother, Anthony Preidis, had his vehicle on the morning of October 28, 2024. Preidis's vehicle was searched, and a blue pry bar and a yellow pry bar with tape around the middle were found. The two pry bars found in Preidis's vehicle matched those seen on Bressner's Ring video footage. Detective Chase interviewed Anthony, who was going to turn himself in for the burglary that was captured on video. Anthony admitted his cousin

(defendant) asked him to drive to the residence and ring Bressner's doorbell. The rest of Anthony's confession was consistent with Bressner's Ring video footage and what Detective Chase found during the investigation, including shoe prints.

¶ 13    The State further argued the proof was evident and the presumption was great defendant committed the charged offenses by summarizing the evidence provided at the probable cause hearing. In light of the victim reporting multiple firearms were stolen and defendant's actions being caught on video, such was enough to support the presumption the offenses were committed.

¶ 14    As it pertained to detention, the State argued defendant posed a real and present threat to the safety of any person and persons in the community since defendant, a convicted felon, forcibly entered a person's home wearing a mask with the intent to commit crimes. The State argued no conditions of pretrial release would mitigate the danger posed by defendant, especially considering he scored a 13 out of 14 on the Virgina Pretrial Risk Assessment Instrument-Revised (VPRAI-R), indicating a high risk of committing another offense. In addition, defendant, a felon in possession of a weapon, was congregating with individuals engaged in residential burglaries and was also engaging in criminal activities by breaking into someone's house, wearing a ski mask to cover his identity. Such activity is an inherent threat to the safety of people and the community. While the State had not alleged willful flight, defendant also had several prior failures to appear.

¶ 15    In response, defense counsel conceded there may be probable cause, but the information provided did not reach the necessary level of proof. Counsel stated defendant would abide by all pretrial conditions, including reporting, monitoring, and testing by OSPS. Counsel acknowledged defendant had a criminal past and some failures to appear, but the State could not meet its burden, as no one saw defendant with a gun. In addition, counsel noted defendant never admitted to officers he was involved in the crimes charged.

¶ 16    The trial court considered the evidence presented, the applicable statutes, the probable cause statement, the pretrial detention report, and the evidence and arguments of counsel. The court found the State had met its burden of proof, granted the State's petition, and ordered defendant to be detained pending trial. The court noted a very thorough investigation had occurred "that links up the chain all along the way." The court cited the video footage that partially identified defendant, as well as "codefendants" who "implicate[d] the defendant."

¶ 17    The trial court then determined defendant posed a real and present threat to the community. The court noted, "[W]e have a random act of criminality, invading the privacy of some stranger's home, and doing so in a violent manner breaking into the home, all to steal some firearms, and by a person who is not legally entitled to possess firearms to begin with." The court found it concerning such acts "would go on" and stated defendant "puts the entire community at risk."

¶ 18    Finally, the trial court determined there were no "conditions of pretrial release or combination thereof [that] could mitigate the very real threat to the safety of the community." The court considered defendant's history of property crimes, a pending theft case, and a prior burglary case that placed him on probation, which was revoked, and he was then sentenced to the Illinois Department of Corrections. The court noted defendant had five pending charges in three separate counties and was on pretrial release. The mandatory conditions of pretrial release were violated multiple times in each case, and the conditions were simply the basic conditions imposed by statute. The court noted defendant was unlikely to comply with any pretrial release conditions.

¶ 19    Pursuant to Illinois Supreme Court Rule 604(h)(2) (eff. Apr. 15, 2024), defendant filed a motion for relief. At the hearing, defendant claimed a change in circumstances in that his mother was in the hospital in need of care, and he requested release. The State argued the case

involved very serious felonies and no conditions could be imposed that would mitigate the risk defendant posed.

¶ 20 The trial court took judicial notice of the detention hearing, the pretrial bond report, and the new information and denied defendant's motion.

¶ 21 This appeal followed.

¶ 22                                II. ANALYSIS

¶ 23 Defendant has elected to have his motion for relief serve as his argument on appeal. Regardless of whether an optional memorandum is filed, issues raised in a motion for relief are properly before the appellate court. Ill. S. Ct. R. 604(h)(7) (eff. Apr. 15, 2024). In defendant's motion for relief, he asserts the State did not prove by clear and convincing evidence (1) he committed a qualifying offense and (2) there was no condition or combination of conditions that could mitigate any risk he posed.

¶ 24 Section 110-2(a) of the Code provides that all criminal defendants are presumed eligible for pretrial release, subject to certain conditions. 725 ILCS 5/110-2(a) (West 2022). The Code provides, in pertinent part, the State may petition for pretrial detention if (1) a defendant is charged with a detainable offense as enumerated in the Code and the proof is evident or the presumption great he committed the offense, (2) the defendant's release would pose "a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case," and (3) "no condition or combination of conditions" can mitigate the threat. *Id.* § 110-6.1(d), (e)(1)-(3).

¶ 25 A finding of dangerousness alone does not automatically warrant pretrial detention. *People v. Atterberry*, 2023 IL App (4th) 231028, ¶ 18 (finding pretrial detention requires more than a detainable offense and a threat to public safety). "Instead, the trial court must determine,

based on the specific facts of the case and the defendant's individual background and characteristics, whether any combination of conditions can mitigate the threat and allow the defendant's release." *Id.* "In each case, a court must conduct an 'individualized' assessment of the propriety of detaining the defendant versus releasing him or her with conditions. [Citation.] '[N]o single factor or standard may be used exclusively to order detention.' " *Id.* ¶ 15. The State bears the burden of proving by clear and convincing evidence that no condition or combination of conditions would mitigate the threat posed by the defendant to any person or the community. 725 ILCS 5/110-6.1(e)(3) (West 2022). If the trial court decides to deny pretrial release, the detention order must include findings "summarizing the court's reasons for concluding that the defendant should be denied pretrial release, including why less restrictive conditions would not avoid a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case." *Id.* § 110-6.1(h)(1).

¶ 26        The supreme court recently clarified the standard of review in pretrial detention cases as follows:

> "(1) when live witness testimony is presented at a pretrial detention hearing, the circuit court's ultimate detention decision under section 110-6.1, in addition to any underlying factual findings supporting the decision, will not be disturbed on review unless found to be contrary to the manifest weight of the evidence and (2) when the parties to a pretrial detention hearing proceed solely by proffer, the reviewing court is not bound by the circuit court's factual findings and may therefore conduct its own independent *de novo* review of the proffered evidence and evidence otherwise documentary in nature." *People v. Morgan*, 2025 IL 130626, ¶ 54.

Here, the State only presented evidence by proffer, so our standard of review is *de novo*. *Id.*

¶ 27    We conclude the State did prove by clear and convincing evidence the proof was evident and the presumption was great that defendant committed two qualifying offenses enumerated under the Code, namely, residential burglary (count I) and unlawful possession of a weapon by a felon (count II). As the trial court noted, there was a thorough investigation that linked defendant to the burglary. Bressner's Ring video footage showed three individuals breaking into his home before carrying away multiple guns and driving away in a black SUV. Through the footage, officers were able to locate the SUV involved, as well as Albert, its owner. Officers searched Albert's vehicle and located distinct pry bars that matched those depicted on the Ring video footage of the burglary. Albert also told officers his brother, Anthony, frequently used his vehicle and was using it on the morning of burglary. Anthony was later interviewed by police and admitted his involvement in the crime and said he was going to turn himself in. Anthony confessed defendant had him drive to Bressner's residence and ring the doorbell, but he denied knowing the intended purpose for going to that residence.

¶ 28    In addition, officers were able to search through defendant's personal items stored in a property tote while he was incarcerated for another offense. Officers located Nike shoes and a black ski mask matching those worn by the subject in the Ring video footage who used a pry bar to gain access to Bressner's residence. Officers noted the similarity in defendant's tattoos to those on the subject at the rear door, as shown in Bressner's Ring video footage. Between Anthony's confession and the matching characteristics and belongings (tattoos, shoes, ski mask, and pry bar), the State's proffered evidence established a clear connection between defendant and the crimes charged. Thus, the State met its burden of proof that defendant committed two qualifying offenses, residential burglary (count I) and unlawful possession of a weapon by a felon (count II).

¶ 29 Next, defendant argues the State failed to prove there was no condition or combination of conditions that could mitigate any risk he posed. We disagree.

¶ 30 As a convicted felon and a person on pretrial release, defendant was prohibited from possessing firearms. Despite this, defendant committed burglary to illegally obtain weapons he could not legally possess. Defendant has a history of property crimes, prior burglary charges where probation was revoked and prison was imposed, a high VPRAI-R score indicating a high likelihood of committing future offenses, and five pending criminal charges for theft, criminal trespass, methamphetamine delivery, driving on a revoked license, and possession of controlled substances. In each of those cases, defendant could not even uphold the basic statutory conditions of pretrial release. Defendant has repeatedly shown his willful defiance of court orders and conditions, which is indicative of his likelihood of reoffending. Therefore, defendant poses a risk to the community that cannot be addressed by any condition or combination of conditions of pretrial release. For the reasons stated above, denial of defendant's pretrial release was proper.

¶ 31 III. CONCLUSION

¶ 32 For the reasons stated, we affirm the trial court's judgment.

¶ 33 Affirmed.